David N. Chandler, Sr.   SBN 60780
David N. Chandler, Jr.   SBN 235427
DAVID N. CHANDLER, p.c.
1747 Fourth Street
Santa Rosa, CA  95404
Telephone: (707) 528-4331

Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE:                           CASE No. 10-12153

                                 CHAPTER 11
PROWEST MEDIA CORPORATION,


_____Debtor._____/

PROWEST MEDIA CORPORATION,       A.P. No.

                 Plaintiff,

v.
                                 COMPLAINT TO AVOID SECURITY
JIM FRENCH STUDIOS, INC.,        INTEREST AND/OR TO DETERMINE
                                 NATURE AND EXTENT OF SECURITY
_____Defendant._/      INTEREST

    PROWEST MEDIA CORPORATION, Plaintiff herein alleges:

    1.    That the above entitled Court has jurisdiction over the
within matter pursuant to 28 U.S.C. § 1334.

    2.    That the within matter is a core proceeding pursuant to 28
U.S.C. § 157(b)(2)(K) and (O).

    3.    Plaintiff is the Debtor in possession the above captioned
Chapter 11 case and has standing pursuant to 11 U.S.C. § 544 to
avoid transfers avoidable under Title 11.

    4.    On or about May 13, 2003, Plaintiff entered into an Asset
Purchase Agreement with Colt Studios, a California corporation.  The
Asset Purchase Agreement was executed on the part of the seller by

Colt Studios, a Nevada corporation. A true and correct copy of the Asset Purchase Agreement is attached hereto as Exhibit A.

5. The assets to be sold pursuant to the Asset Purchase Agreement are described in paragraph 1.1 and listed in Schedule 1.1.

6. The seller was to be secured by the assets sold as provided in paragraph 2.1 of the Asset Purchase Agreement.

7. A Security Agreement, Exhibit B, was executed by Plaintiff and provides for a security interest in collateral described in Schedule 1(a) attached thereto in favor of Colt Studio, a California corporation.

8. Colt Studio failed to perfect its security interest in the collateral by filing a UCC-1.

9. Jim French Studios, Inc., Defendant herein, filed its UCC-1 on or about June 21, 2003 describing the collateral set forth in Schedule 1(a) of the Security Agreement. Said filing was in violation of California Commercial Code Section 9510(a) as Defendant was not authorized to file a financing statement.

10. The collateral described in the Security Agreement is limited to the collateral sold to the Plaintiff. Excluded are proceeds and replacements of such collateral and material and images developed, created or produced after the close of the sale by the Plaintiff.

FIRST CLAIM FOR RELIEF
(Avoidance of Unperfected Security Interest)

11. The security interest of the Defendant, if any, is unperfected.

12. Pursuant to 11 U.S.C. § 544(a) and (b), the security interest of the Defendant and of Colt Studio, a California

corporation is avoidable.

13.  Pursuant to 11 U.S.C. § 551, such avoided interest is subject to preservation for the benefit of the estate.

SECOND CLAIM FOR RELIEF
(Determination of Nature, Extent and Priority of Lien)

14.  Any lien of the Defendant is limited to the collateral sold by Colt Studios, a Nevada corporation as described in Schedule 1(a) of the Security Agreement.

15.  The replacement of such collateral, the addition to the images and inventory, any after acquired property, accounts receivable and proceeds are excluded from the collateral in which the Defendant is secured.

16.  Plaintiff requires a determination of such nature and extent of any perfected security interest.

THIRD CLAIM FOR RELIEF
(Determination of Secured Claim 11 U.S.C. § 506)

17.  Plaintiff requests determination of the secured status of the Defendant pursuant to 11 U.S.C. § 506.

18.  Defendant, to the extent perfected, is secured by collateral described in Schedule 1(a) of the Security Agreement and is secured only to the extent of the value of said collateral.

19.  Plaintiff requires a determination of said value and said secured status.

WHEREFORE, Plaintiff prays judgment as to Defendants, and each of them, as follows:

1.  For avoidance of the unperfected lien of the Defendant in the collateral described in Schedule 1(a) of the Security Agreement pursuant to 11 U.S.C. § 544;

2.  For preservation of such avoided interest in said

1  collateral for the estate pursuant to 11 U.S.C. § 551;

2      3.   For a determination of the nature and extent of the

3  security interest of the Defendant in the collateral described in

4  Schedule 1(a) of the Security Agreement and for determination that

5  same is limited to the assets sold and does not extend to the

6  proceeds, replacements, or additions;

7      4.   For determination of the secured status of the interest of

8  the Defendant in the collateral, if any, pursuant to 11 U.S.C. §

9  506;

10     5.   For costs of suit incurred herein; and

11     6.   For such other and further relief as the Court determines

12 is just and proper.

13 Dated: 7/2/10                    DAVID N. CHANDLER, p.c.

14

15                                 By: /s/ David N. Chandler
                                   DAVID N. CHANDLER,
16                                 Attorney for Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28

4

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of May 13, 2003, by and among COLT STUDIOS ("Seller"), a California corporation, PROWEST MEDIA CORPORATION ("Buyer"), a California corporation, JIM FRENCH ("Jim"), and JOHN RUTHERFORD ("John").

RECITALS:

Seller owns and operates an adult male video, film, DVD, calendar, magazine and merchandise business known as Colt Studio (the "Business"), located at 7533 Lankershim, North Hollywood, California 91601 (the "Premises"), and all tangible and intangible property used in its operation.

Jim is the sole officer, director and shareholder of Seller and the owner of the Premises.

Seller desires to sell to Buyer the Assets (as hereinafter defined) and grant to Buyer the option and first right of refusal to purchase the Unpublished Colt Images (as hereinafter defined) and Buyer desires to acquire the Assets and to have the option and first right of refusal to purchase the Unpublished Colt Images; Jim desires and Buyer agrees to lease the Premises for one (1) month after the Closing (as hereinafter defined); Jim and Buyer desire for Jim to consult with and provide photographic services for Buyer; and Jim agrees not to compete with Buyer, all on the terms and conditions set forth herein.

John is the sole officer, director and shareholder of Buyer.

NOW, THEREFORE, in consideration of the premises and mutual covenants hereinafter set forth and other good and valuable consideration, the parties hereto, on the basis of, and in reliance upon, the representations, warranties, covenants, obligations and agreements set forth in this Agreement, and upon the terms and subject to the conditions contained herein, hereby agree as follows:

ARTICLE I

SALE AND TRANSFER OF ASSETS AND LEASE OF PREMISES

1.1 <u>Sale of the Assets</u>. Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell,

1

EXHIBIT "___A___"

Case: 10-01080   Doc# 1   Filed: 07/02/10   Entered: 07/02/10 13:33:03   Page 5 of 80

convey, transfer, assign and deliver to Buyer, and Buyer shall purchase and acquire from Seller, all right, title and interest in certain of the tangible and intangible properties used in the operation of the Business (collectively, the "Assets") as set forth in Schedule 1.1.

All of the Assets shall be sold to Buyer at the Closing in **"AS IS, WHERE IS CONDITION,"** without representation or warranty as to fitness for any particular purpose, use or merchantability. Buyer acknowledges that, prior to the date of execution of this Agreement, it has conducted a full and complete inspection of all tangible and intangible personal property of Seller and Seller has made available to Buyer all lists of tangible personal property and shall provide to the Buyer the full opportunity to conduct further inspections of Seller's intangible property and any other due diligence inspection of these Assets which Buyer desires to conduct prior to the Closing Date. **Except for the representation and warranty set forth in Section 3.2, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, REGARDING THE TANGIBLE AND INTANGIBLE PERSONAL PROPERTY TO BE SOLD TO BUYER PURSUANT TO THIS AGREEMENT.**

Except for any inventory sold by Seller in the ordinary course of business between the date of execution of this Agreement and the Closing, Seller shall deliver to Buyer all of the Assets at the Closing. The parties agree to revise Schedule 1.1 on or immediately before the Closing Date to reflect the actual inventory and other Assets being transferred and delivered to Buyer as of that date. The revised Schedule 1.1 shall be initialed and dated by John, as President of Buyer, and Jim, as President of Seller, as true and correct as of the date of the revision.

1.2 _Excluded Assets_. Seller is not selling and Buyer is not purchasing any assets not listed in Schedule 1.1, including cash on hand or in the bank, accounts receivable, credit card checking reserves, credit card charges in transit, prepaid expenses and deposits, advances to officers, automotive equipment (except for the automobile subject to the Auto Lease), photographic equipment, unpublished Colt images, judgment of Seller against Ahmen and any pending claims and lawsuits of Seller against other parties, and Jim French/State of Man images in all formats(collectively, the "Excluded Assets"), all of which shall be retained by Seller.

1.3 _Lease of the Premises_. On or before the Closing Date, Jim shall terminate the lease of the Premises with Seller and on the Closing Date shall lease the Premises to Buyer for one (1)

2



month following the date of Closing for $4,000 for the month (the "Lease") in the form attached as Exhibit A. During the Lease term, Jim shall have the right to post "for sale" signs on the Premises and to show it to possible buyers, provided that any showing shall not materially interfere with Buyer's conduct of its business on the Premises.

On or immediately before the Closing, Seller shall cause each utility service providing services to or for the Premises to issue to Seller statements for the balances then due for utility services to the Premises, including telephone, electric, gas, water and waste removal, and Seller shall pay all such charges when due. Buyer shall use all such utility services in the name of Seller during the term of the Lease and shall timely pay to each utility service or timely pay to Jim, or as otherwise directed by Jim, all charges by such utility services to the Premises during the term of the Lease.

1.4 <u>No Assumption of Liabilities or Obligations of Seller</u>. Buyer shall not assume any liabilities or obligations of Seller of any kind or nature whatsoever, whether with respect to the Assets or otherwise. Notwithstanding the foregoing, Buyer shall assume and be responsible for any and all obligations arising from Buyer's operation of its business following the Closing.

Notwithstanding the foregoing, Buyer shall assume and pay all obligations under the promissory note dated February 14, 2001 (Loan Number 501000682) by and between Seller and First Commerce Bank (the "Loan") which was incurred in connection with Seller's acquisition of the 1996 green GMC SV (VIN 1GKDM19W9TB508175)(the "Auto"), or in the event the Loan is not assumable, acquire the Auto subject to the Loan. Buyer shall indemnify, defend and hold Seller harmless for Buyer's failure to perform its obligations under the Loan following the Closing Date.

ARTICLE II

PURCHASE PRICE, PAYMENTS AND TRANSACTIONS BEFORE AND AT CLOSING

2.1 <u>Purchase Price</u>. In exchange and as consideration for the Assets and in full payment of the purchase price therefor, Buyer shall pay Seller, in the manner provided in Section 2.6, an aggregate purchase price of Two Million Four Hundred Ninety-Five Thousand Dollars ($2,495,000) and the "Earn-Out," as provided in Section 2.4(a) (the "Purchase Price").

2.2 <u>First Lien</u>. Seller shall be granted a first lien (the "First Lien") on all Assets sold or otherwise transferred by

3



Seller to Buyer hereunder and the Life Insurance Policy (as defined below). The First Lien shall be recorded with the appropriate state agencies and shall remain recorded until the obligations of Buyer to Seller, as evidenced by the Promissory Note and Earn-Out, are fully paid and satisfied. On or within ten (10) days after Buyer's obligations under the Promissory Note and Earn-Out have been paid and satisfied in full, Seller shall execute and deliver to Buyer all such documents required to release the First Lien. If Seller for any reason shall fail to so execute and deliver such documents to Buyer after all obligations under the Promissory Note and Earn-Out have been satisfied in full, Seller hereby irrevocably appoints Buyer as its attorney-in-fact coupled with an interest to execute on behalf of Seller all such documents required to release the First Lien. Seller and Buyer shall execute the Security Agreement in the form attached as Exhibit C and shall comply with all terms, conditions and provisions thereof on their respective parts to be observed or performed.

2.3 <u>Allocation of Purchase Price</u>. The parties agree in good faith to allocate the Purchase Price as set forth in Schedule 2.3. The parties shall file their respective tax returns and IRS Form 8594 in accordance with such allocation and shall not take any position or action inconsistent with such allocation.

2.4 <u>Payment of Earn-Out</u>. As additional consideration for the sale of the Assets by Seller to Buyer, Buyer shall pay to Seller seven and one-half percent (7-1/2%) of Buyer's net income after federal and California income taxes (the "Earn-Out") for the 12-month periods ending August 31, 2004, August 31, 2005, August 31, 2006, August 31, 2007, and August 31, 2008 (the "Earn-Out Payment Term"), payable quarterly for the period commencing September 1, 2003 through July 31, 2008 with the end of the first quarter on November 31, 2003, within 30 days after the end of each quarter, subject to an annual reconciliation of the amounts of the Earn-Out payable for each 12-month period, payable within 75 days after the end of each 12-month period, together with a payment, if an additional amount is then due, or if none is then due, a credit in the amount of the overpayment, shall be applied against the next quarterly payment(s) until fully applied. If the annual reconciliation of the amount of the Earn-Out payable for the last 12-month period shows a credit payable by Seller to Buyer, Seller shall pay the entire amount of the credit to Buyer within 30 days of its receipt of the reconciliation. If any amount payable under this Section is not timely paid, the defaulting payer shall pay interest thereon at the annual rate of ten percent (10%) until paid in full and a penalty of three percent (3%) of the amount due, which charge Seller and Buyer agree is a reasonable estimate of the extra expenses Seller or Buyer, as the case may be, shall incur.

4



The Earn-Out shall be determined by Buyer's accountants on the accrual method of accounting in accordance with generally accepted accounting principles, provided that, for this purpose only, (a) compensation paid to John, Tom Settle and Terry Mahaffey (and any person or entity related to them) for any 12-month period during the Earn-Out Payment Term shall not exceed Two Hundred Fifty Thousand Dollars ($250,000), (b) any payments due to Seller under the Promissory Note or the Earn-Out payment shall be excluded, and (c) any expenses incurred by Buyer to defend any lawsuit by Conwest Resources, Inc., a California corporation, John's former employer, or any related entity (collectively, "Conwest"), against Buyer, Jim, Seller, and/or John or payment by Buyer of any damages to Conwest as a result of John's termination of employment with Conwest, the purchase of the Assets, and/or the use of Conwest property shall be excluded. Payments of the Earn-Out shall be determined in accordance with the cash method of accounting so that Buyer shall pay to Seller only current and previously determined Earn-Out amounts actually paid to or on behalf of the Buyer in computing the amount of each quarterly Earn-Out payment due to Seller and the annual reconciliation of the Earn-Out for any 12-month period during the Earn-Out Payment Term. Amounts payable as calculated pursuant to the cash method of accounting shall be paid at such time that the revenue is actually received by the Buyer and shall be payable to the date of the end of the Earn-Out Payment Term.

In the event of any merger, consolidation, liquidation, sale or other restructuring of the Buyer or the sale of all or substantially all of the assets of Buyer prior to the expiration of the Earn-Out Payment Term, the surviving or successor entity shall thereafter assume all rights, obligations and liabilities of Buyer with respect to the payment of the Earn-Out to Seller.

Seller shall have the right from time to time to conduct complete audits of Buyer's books and records; provided, however, that Seller may not audit Buyer's books and records more than once during each year of the Earn-Out Payment Term. If, as a result of any audit, following agreement of the parties or arbitration as provided below, the Earn-Out payment is determined to be understated by five percent (5%) or more, the reasonable fees and other charges of the audit shall be paid by Buyer. If any audit report indicates that any additional amount is owed by Buyer to Seller, Seller shall deliver a detailed written audit report to Buyer. Within thirty (30) days of its receipt of the audit report, Buyer shall either object to the results of the audit report or shall pay to Seller the additional amount shown in the audit report. If Buyer objects to the audit report, Buyer shall notify Seller of its objection and the reasons for its objections in

5



writing within thirty (30) days of its receipt of the audit report. Thereafter, Buyer and Seller shall attempt in good faith to resolve any disputes concerning any audit report for a period of fifteen (15) days following Seller's receipt of written notice from Buyer of its objections to the audit report. If the dispute is not resolved within that fifteen (15) day period, Seller may resolve the dispute by commencing an arbitration proceeding in accordance with the procedures set forth in Section 9.11. Failure of Buyer to notify Seller within the thirty (30) day period shall mean that Buyer has accepted the audit report.

2.5 <u>Sales, Property and Other Taxes</u>. Seller shall pay any sales or use taxes payable in connection with the sale of the Assets to Buyer, and shall pay its portion, prorated as of the Closing Date, of state and local real and personal property taxes of the Business. Buyer shall not be responsible for any business, occupation, withholding or similar taxes, or any taxes of any kind incurred by Seller relating to any period before the Closing Date. Seller agrees to indemnify, defend and hold Buyer harmless from and against any liability for, or arising from any taxes (and any related fines, interest or penalties) that are required to be paid by Seller under this Section or for which Buyer is not responsible under this Section.

2.6 <u>Payment of Purchase Price and Other Matters</u>. Concurrent with the execution of this Agreement, Buyer shall deposit with The Mechanics Bank Business Escrow Services ("Escrow Holder") Five Thousand Dollars ($5,000), in good funds, which Escrow Holder shall hold and distribute in accordance with the terms of the Escrow Agreement attached hereto in the form of Exhibit D, and Buyer shall deposit with Peter S. Buchanan ("Buchanan"), the attorney for Buyer, Two Hundred Ninety-Five Thousand Dollars ($295,000) in good funds in his law firm trust account subject to written confirmation by Buchanan to Seller of the deposit, which funds Buchanan shall deliver to Escrow Holder under the terms of Escrow Agreement at least two days prior to the Closing; provided, however, if there is no Closing, upon Buyer's request Buchanan shall deliver these funds to Buyer without interest. At the Closing (as defined below), Buyer shall deliver to Escrow Holder Buyer's Promissory Note, dated as of the Closing Date, in the principal amount of Two Million Two Hundred Thousand Dollars ($2,200,000) in the form of Exhibit E, which Escrow Holder shall hold and distribute in accordance with the terms of the Escrow Agreement.

2.7 <u>Bulk Transfer Law</u>. Escrow Holder shall give notice in compliance with Division 6 of the California Commercial Code of the bulk transfer contemplated by this Agreement. Seller shall

6



furnish to Escrow Holder all information necessary to prepare this notice, including all names and business addresses used by Seller within the last three years and the location of all the assets to be transferred under this Agreement, at least twenty (20) days before the Closing Date.

2.8 <u>California Payroll Taxes</u>. Seller shall, by and through Escrow Holder, obtain (a) a "Certificate of Payment" from the State of California Board of Equalization for the period from the commencement of its operations up to and including the Closing Date, and (b) Seller has, and for the past year has had, twenty-three (23) employees and shall owe no withholding or other payments related to any employees prior to the Closing Date. Within ten (10) days of the date of this Agreement, Seller shall provide to Escrow Holder copies of all of its permits and/or applicable account numbers with the State of California Board of Equalization, and a certificate or statement from the Employment Development Department indicating that there are no due or unpaid contributions, interest or penalties to the California unemployment fund, employment training fund, or unemployment compensation disability fund.

2.9 <u>Sales and Use Tax Liabilities on Prior Sales</u>. Seller shall, by and through Escrow Holder, as described in the Escrow Agreement, obtain a clearance certificate from the State Board of Equalization and related certificates that Buyer may reasonable request as evidence that all sales and use tax liabilities of Seller accruing before the Closing Date have been fully satisfied or provided for.

2.10 <u>UCC Search and Clearance</u>. A UCC information search shall be performed by and through Escrow Holder, as described in the Escrow Agreement, to determine whether any liabilities currently exist with respect to any of the Assets as reflected in the public records of the California Secretary of State. To the extent the UCC search determines that there are any liabilities encumbering any of the Assets, Seller and Buyer shall mutually agree upon all necessary steps for Seller to pay and/or discharge such liabilities on or before the Closing Date.

2.11 <u>Option Agreement</u>. Seller and Buyer shall execute the Option Agreement pursuant to which Buyer shall have the option and first right of refusal to purchase the Colt Unpublished Images (the "Option Agreement") in the form attached as Exhibit F and shall comply with all terms, conditions and provisions thereof on their respective parts to be observed or performed.

7

2.12 <u>Noncompetition Agreement</u>. Jim shall execute and deliver to Buyer the Noncompetition Agreement in the form attached as Exhibit G and shall comply with all terms, conditions and provisions thereof on his part to be observed or performed.

2.13 <u>Consulting and Photographic Services Agreement</u>. Jim shall execute the Consulting and Photographic Services Agreement in the form attached as Exhibit H and shall comply with all terms, conditions and provisions thereof on his part to be observed or performed.

2.14 <u>Security Agreement</u>. Seller and Buyer shall execute the Security Agreement in the form attached as Exhibit C and shall comply with all terms and conditions thereof on their respective parts to be observed or performed.

2.15 <u>Closing</u>. The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place on June 9, 2003 (the "Closing Date"), at 10:00 a.m. at an agreed place, or such other date and time as may be agreed upon in writing by the parties. All proceedings to take place at the Closing shall take place simultaneously, and no delivery shall be considered to have been made until all such proceedings have been completed. At the Closing:

(a) Escrow Holder shall deliver Two Hundred Ninety-Five Thousand Dollars ($295,000) of that amount for the purchase of the Assets, less any charges to Seller's account, to Seller, and Five Thousand Dollars ($5,000) of that amount to Jim as payment of the amount payable to him under the Noncompetition Agreement.

(b) Buyer shall execute and deliver to Seller the Lease, the Auto Lease, the Accounting Software Program Lease, the Security Agreement, the Escrow Agreement, the Noncompetition Agreement, the Option Agreement, the Promissory Note, the Consulting and Photographic Services Agreement, and the Assignment of Assets in the form attached as Exhibit I and shall deliver or cause to be delivered to Seller a term life insurance policy on John's life in an amount sufficient at all times to pay Seller the balance then due under the Promissory Note (the "Life Insurance Policy"), and shall provide that in the event of John's death before payment of the Promissory Note, the insurance company shall pay to Seller from life insurance proceeds the amount of any balance then due under the Promissory Note and shall distribute the balance of the life insurance proceeds as directed by John under the Life Insurance Policy.



8

(c) Seller shall execute and deliver to Buyer the Escrow Agreement, the Option Agreement, the Security Agreement, Assignment of Assets, the Auto Lease, and Accounting Software Program Lease and shall execute and deliver to Buyer all such other instruments and documents of conveyance and assignment as are reasonably requested by Buyer to vest in Buyer title to the Assets.

(d) Jim shall execute and deliver to Buyer the Lease, the Escrow Agreement, and the Noncompetition Agreement.

(e) Seller shall transfer and deliver to Buyer a bill of sale and assignment for the Assets (the "Bill of Sale") in the form attached hereto as Exhibit J, in order to convey, transfer, deliver and assign to Buyer all of the Assets.

(f) Seller shall pay all sales and use taxes arising from the transfer of the Assets and Seller and Buyer shall each pay their respective portions, prorated as of the Closing Date, of any state and local personal property taxes for the Assets. Buyer shall furnish to Seller any resale certificate or other documents reasonably requested by Seller to comply with the provisions of the sales and use tax laws of the State of California. Buyer shall not be responsible for any business, occupation, withholding or any taxes of Seller related to any period before the Closing Date.

(g) Escrow Holder shall record with the California Secretary of State a UCC financing statement in the form attached hereto as Exhibit K evidencing the Collateral as security for the Note in accordance with the Security Agreement.

2.16 <u>Change of Seller's Corporate Name</u>. After the Closing Date, Seller and Jim shall not use or employ in any manner, directly or indirectly, the name Colt Studios and shall take or cause to be taken all necessary action by its shareholders, board of directors and any other persons to make the change in Seller's name, which shall be performed by Escrow Holder on or before the Closing Date.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that each of the following representations and warranties is true now and shall be true as of the Closing Date with respect to Seller and the Assets:

3.1 <u>Qualification</u>. Seller is a corporation duly organized, validly existing, and in good standing under the laws of

9



California, has all necessary corporate power to own its properties and to carry on its business as now owned and operated by it, and is duly qualified to do business in each jurisdiction in which the character of its properties and the nature of its business makes such qualification necessary and is in good standing in each of those jurisdictions. Seller has all requisite power and authority to own, use, license, lease and sell the Assets and to carry on its business as it is now being conducted.

3.2 <u>Title to the Assets</u>. Seller has good and marketable title to all of the Assets (other than the automobile subject to the Auto Lease and the accounting software program subject to the Accounting Software Program Lease), whether tangible or intangible, and, except as otherwise set forth and fully described in Schedule 3.2, all of the Assets conveyed to Buyer are free and clear of any liens, liabilities, pledges, charges, encumbrances, security interests, leases, or licenses. Seller has the absolute and unrestricted right, power, authority and capacity to transfer the Assets (other than the automobile subject to the Auto Lease and the accounting software program subject to the Accounting Software Program Lease) to Buyer and upon the Closing, without exception, Buyer shall acquire from Seller legal and beneficial ownership of, and good and valid title to, the Assets (other than the automobile subject to the Auto Lease and the accounting software program subject to the Accounting Software Program Lease), free from any charge, lien, encumbrance, liability, pledge, security interest, lease, or license.

3.3 <u>Financial Statements</u>. Schedule 3.3 sets forth the balance sheets and income and expense statements of Seller as of January 31, 2002 and January 31, 2003, and for the period from February 1, 2003 to the close of business of Seller on the day immediately preceding the Closing Date, prepared in accordance with generally accepted accounting principles consistently followed by Seller throughout the periods indicated, and fairly present the financial position of Seller as of the respective dates of the balance sheets and income and expense statements included and the results of its operations for the respective periods indicated.

Since the date of the last balance sheet and income and expense statement of Seller, there has not been any material change in the financial condition or operations of Seller, except changes in the ordinary course of business, which have not in the aggregate been materially adverse.

3.4 <u>Tax Returns and Audits</u>. Within the times and in the manner prescribed by law, Seller has filed all federal, state and local tax returns required by law and has paid all taxes,

10

assessments and penalties due and payable. None of the tax returns are being audited and there are no present disputes about taxes of any nature payable by Seller.

3.5 <u>Inventory</u>. The inventory of all Colt magazines, calendars, videos, films and DVDs are the property of Seller, except for all sales made in the ordinary course of business since the date of this Agreement. No items in inventory are subject to any security interest, except as set forth in Schedule 3.5.

3.6 <u>Other Tangible Personal Property</u>. Except as provided in Schedule 3.6, no equipment, machinery, furniture, supplies, trucks, automobiles, or tangible personal property owned or in the possession of, or used by Seller in connection with its business, is held under any lease, security agreement, conditional sales contract, or other title retention or security arrangement, or is other than in the possession and under the control of Seller.

3.7 <u>Tradenames, Trademarks and Copyrights</u>. Schedule 3.7 is a schedule of all tradenames, trademarks, service marks and copyrights, and their registrations owned by Seller, together with a brief description of each. Seller has no knowledge of any infringements or alleged infringements by others of any such tradenames, trademarks, service marks, or copyrights, and Seller is not a party to any license, agreement or other arrangement, whether as licensor, licensee or otherwise, with respect to any tradenames, trademarks, service marks, or copyrights, or applications for them. Seller has the right to sell to Buyer all such tradenames, trademarks, service marks and copyrights free and clear of restrictions on or conditions to transfer or assignment, and free and clear of liens, liabilities, pledges, charges, encumbrances, equities, claims, covenants, conditions or restrictions, or any other adverse claims or rights whatsoever.

3.8 <u>Compliance with Laws</u>. Except as provided on Schedule 3.8, Seller has not received notice of any violation of any federal, state or local statute, law or regulation affecting the Assets or the operation of its business and to the best of Seller's knowledge, there are no such violations.

3.9 <u>Authority Relative to This Agreement</u>. Seller has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby on the part of Seller have been duly and validly authorized and no other proceedings on the part of Seller are necessary, as a matter of law or otherwise, to authorize this Agreement or to consummate the transactions so

11

contemplated. This Agreement has been duly and validly executed and delivered by Seller and constitutes a legal, valid and binding agreement of Seller, enforceable against Seller in accordance with its terms.

3.10 <u>Consents and Approvals; No Violation</u>. Except as set forth on Schedule 3.10, the execution and delivery of this Agreement by Seller, the consummation of the transactions contemplated hereby and the performance by Seller of its obligations hereunder shall not:

(a) require any consent, approval, waiver, authorization or permit of, or filing with or notification to, any governmental or regulatory authority or any non-governmental third party;

(b) conflict with, result in the breach of or constitute a default (or give rise to any right of termination, cancellation or acceleration or guaranteed payments) under any of the terms, conditions or provisions of any note, lease, license, agreement or other instrument or obligation to which Seller is a party or by which Seller or any of its assets may be bound;

(c) conflict with or violate the provisions of any order, writ, injunction, judgment, decree, statute, rule or regulation applicable to Seller; or

(d) result in the creation of any lien, charge or encumbrance upon any of the Assets.

3.11 <u>Litigation</u>. Except as set forth on Schedule 3.11, there is no claim, action or proceeding pending or, to the knowledge of Seller, threatened against or relating to Seller or any of the Assets before any court or other competent governmental or regulatory authority or body acting in an adjudicative capacity. To the knowledge of Seller, there is no reasonable basis for a claim, action or proceeding against or relating to Seller or the Assets which, if adversely determined, could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change. There is not in existence any order, judgment, or decree of any court or other tribunal or other agency enjoining or requiring Seller to take any action of any kind with respect to the Assets. For purposes of this Agreement, a "Material Adverse Change" shall mean any event, circumstance, condition, development or occurrence causing, resulting in or having a material adverse effect on the Assets or their transfer and assignment to Buyer.



12

3.12 <u>Customers</u>. Schedule 3.12 is a current and expired, accurate and complete list of the customers and former customers of Seller (other than those former customers whose names were deleted from the list in the ordinary course of the Seller's business), including names, addresses, telephone numbers and e-mail addresses. Except as set forth on Schedule 3.12, none of this list has at any time been sold or otherwise transferred to any person or entity by Seller or any other person or entity or is otherwise in the possession of any third party.

3.13 <u>Accurate and Complete Records</u>. Seller's minute book, stock ledgers, books, ledgers, financial records and other records have been made available to Buyer and its agents at Seller's offices or the offices of its attorney.

3.14 <u>Full Disclosure</u>. Except as set forth on Schedule 3.14 or specifically required hereunder, there are no additional documents that Seller or Jim is required to deliver or make available to Buyer. All instruments, agreements and other documents delivered or to be delivered, or made available, to Buyer pursuant to this Agreement are complete and correct in all material respects. No representation or warranty made by Seller and Jim in this Article III or the Schedules to this Agreement contains or shall contain any untrue statement of a material fact or omits or shall omit to state a material fact required to be stated herein or therein necessary to make the statements on behalf of Seller in this Article III and the Schedules to this Agreement, in light of the circumstances in which they are made, not materially misleading.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

4.1 <u>Qualification</u>. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of California, and is duly qualified to do business in the State of California. Buyer has all requisite power and authority to own, use, license, lease or sell its properties and to carry on its business as it is now being conducted and as it is now proposed to be conducted.

4.2 <u>Authority Relative to This Agreement</u>. Buyer has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of

13

the transactions contemplated hereby on the part of Buyer has been duly and validly authorized and no other proceedings on the part of Buyer are necessary, as a matter of law or otherwise, to authorize this Agreement or to consummate the transactions so contemplated. This Agreement has been duly and validly executed and delivered by Buyer and constitutes a valid and binding agreement of Buyer, enforceable against it in accordance with its terms.

4.3 <u>Consents and Approvals; No Violation</u>. Except as set forth on Schedule 4.3, the execution and delivery of this Agreement by Buyer, the consummation of the transactions contemplated hereby or the performance by Buyer of its obligations hereunder shall not:

(a) require any consent, approval, waiver, authorization or permit of, or filing with or notification to, any governmental or regulatory authority or any non-governmental third party;

(b) conflict with, result in the breach of or constitute a default (or give rise to any right of termination, cancellation or acceleration or guaranteed payments) under any of the terms, conditions or provisions of any note, lease, license, agreement or other instrument or obligation to which Buyer is a party or by which Buyer or any of its assets may be bound; or

(c) conflict with or violate the provisions of any order, writ, injunction, judgment, decree, statute, rule or regulation applicable to Buyer.

4.4 <u>Full Disclosure</u>. All instruments, agreement and other documents delivered or to be delivered, or made available, to Seller pursuant to this Agreement are complete and correct in all material respects. No representation or warranty made by Buyer in this Article IV or the Schedules to this Agreement contains or shall contain any untrue statement of a material fact or omits or shall omit to state a material fact required to be stated herein or therein necessary to make the statements on behalf of Buyer in this Article IV and the Schedules to this Agreement, in light of the circumstances in which they are made, not misleading.

4.5 <u>Conwest</u>. Neither John's termination of his employment with Conwest nor Buyer's purchaser of the Assets violates any agreement of John with Conwest. Buyer has not entered into any agreement with Conwest. Neither John nor Buyer are or shall be using any property owned by Conwest in connection with Buyer's or John's businesses.

ARTICLE V

14

COVENANTS

Seller and Buyer, as the case may be, agree as follows:

5.1 <u>Agreement to Hold Information Confidential</u>. Buyer and Seller agree that, unless and until the Closing has been consummated hereunder, Buyer and Seller and each of their respective officers, directors, employees and other representatives shall hold in strict confidence, except for disclosure of information to their respective attorneys, accountants, other representatives, and prospective lenders and their attorneys, accountants and other representatives, and shall not use to the detriment of the other party, any data and information obtained from the other party in connection with this Agreement. If the Closing is not consummated as herein provided, Buyer shall return to Seller all writings and documents with respect to such data, information, agreements and other items obtained from Seller and shall retain in confidence and not use for its own benefit any data or information respecting Seller or the Assets.

5.2 <u>Seller's Obligations to Buyer Before Closing</u>. Seller agrees that, from the date of this Agreement until the Closing, Buyer and its attorneys, accountants and other representatives shall have full access during normal business hours to all properties, records, contracts, documents, and information of Seller relating to the Assets and any other transactions between the parties under this Agreement.

5.3 <u>Ordinary Course of Business</u>. During the period from the date of this Agreement until the Closing Date or the earlier termination of this Agreement, Seller shall carry on its business in the usual, regular and ordinary course, in substantially the same manner as heretofore conducted..

5.4 <u>No Solicitation</u>. During the period from the date of this Agreement until the Closing Date or the earlier termination of this Agreement, without Buyer's prior written consent, Seller shall not, directly or indirectly, through any employee, agent or representative (including investment bankers, financiers, attorneys, accountants and consultants), solicit, initiate or further the submission of proposals or offers from, or enter into any agreement with, any person or entity other than Buyer (a "Third Party"), relating to any acquisition or purchase of all or a material portion of the Assets and the assets subject to the terms of the Option Agreement. Furthermore, prior to the Closing Date, Seller shall not participate in any discussions or negotiations regarding, or furnish to any Third Party any confidential

15

information with respect thereto. Seller shall promptly notify Buyer in writing if any such proposal or offer, or any inquiry or contact with any Third Party with respect thereto, is made. Seller shall immediately cease and cause to be terminated any existing activities, discussions or negotiations with any Third Party conducted prior to the date of this Agreement with respect to any of the foregoing.

5.5 <u>Communications</u>. Between the date hereof and the Closing Date, Seller and Buyer shall not furnish any written communication to the public generally if the subject matter thereof relates to the transactions contemplated by this Agreement without the prior written approval of the other party as to the content thereof, which the other party may refuse to grant without any reason.

5.6 <u>Buyer's Access to the Premises</u>. Buyer, Buyer's attorneys, accountants and other representatives shall collectively have access to the Premises from the date of execution of this Agreement until after the Closing during business hours with two days' advance notice.

5.7 <u>Expenses</u>. Whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such expenses.

5.8 <u>Additional Actions</u>. Subject to the terms and conditions of this Agreement, each of the parties hereto agrees to use all reasonable efforts to take, or cause to be taken, all reasonable action and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement as promptly as reasonably practicable. In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement or to vest Buyer with full title to all of the Assets, each party or the proper officers, directors or employees of each party to this Agreement shall take all such necessary action to vest in Buyer full title to all of the Assets.

5.9 <u>Commissions</u>. Each party warrants to the other party that there are no commissions or finders' fees due or payable to any person or entity as a result of the transactions described in this Agreement and each party shall indemnify, defend and hold the other party harmless from any Losses (as defined in Section 9.1 below) rising from any claim by any party for any such commission

16

or finders' fee payable due to the actions of the indemnifying party.

5.10 <u>Risk of Loss</u>. All risk of loss prior to the Closing Date with respect to the Assets shall be the responsibility of Seller and Jim. In the event of material damage or destruction to the Assets or the Premises prior to the Closing Date, Buyer shall have the right to elect, by giving written notice to Seller and/or Jim, as the case may be, within 30 days of such damage or destruction, to either (a) terminate this Agreement and the Lease, in which event the Deposit shall be returned to Buyer, or (b) proceed to consummate the transactions contemplated by this Agreement provided that Seller and/or Jim assigns to Buyer rights to any insurance proceeds which Seller and/or Jim own which covers the damage or destruction to the Assets and/or the Premises.

If, on or before the Closing, the Premises are not suitable for occupancy by Buyer due to its damage or destruction, Jim shall have the right to elect, by giving written notice to Seller within 30 days after any such damage or destruction, not to lease the Premises to Seller.

ARTICLE VI

CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer set forth in this Agreement are subject to the satisfaction on or prior to the Closing Date of the following conditions, unless waived by Buyer:

6.1 <u>Representations and Warranties</u>. All representations and warranties of Seller set forth in Article III shall be true, correct and complete in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date.

6.2 <u>Performance of Obligations of Seller</u>. Seller and Jim shall have performed, satisfied and complied with in all material respects all covenants, agreements and conditions required to be performed by each of them under this Agreement prior to the Closing Date and Buyer shall have received a certificate dated the date of the Closing to the foregoing effect signed by each of Jim, individually and as President of Seller, stating that he and/or it, as the case may be, has performed, satisfied and complied with in all material respects all covenants, agreements and conditions required to be performed by him and/or it hereunder.

17



6.3 <u>No Litigation</u>. Since the date hereof, there shall not have been instituted and be continuing or threatened against Seller, any claim, action, or proceeding related to any of the Assets which would materially adversely affect the value or use by Buyer or create or cause any expense or cost to Buyer of any of the Assets.

6.4 <u>No Material Adverse Change</u>. No Material Adverse Change shall have occurred.

6.5 <u>Corporate Action</u>. Seller shall have delivered to Buyer Minutes of Meetings or Actions by Written Consent of the Board of Directors and Shareholder of Seller authorizing execution of this Agreement and approving the consummation of the transactions contemplated hereby, in the form attached hereto as Exhibit L.

6.6 <u>Certificate of Good Standing of Seller</u>. Buyer shall receive from Escrow Holder a Certificate of Good Standing of Seller in the State of California from the California Secretary of State.

ARTICLE VII

CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller set forth in this Agreement are subject to the satisfaction on or before the Closing Date of the following conditions, unless waived by the Seller:

7.1 <u>Buyer's Representations and Warranties</u>. All representations and warranties by Buyer set forth in Article IV shall be true, correct and complete in all material respects as of the date of this Agreement and as of the Closing Date as though made as of the Closing Date.

7.2 <u>Performance of Obligations of Buyer</u>. Buyer shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required to be performed by it under this Agreement on or before the Closing Date.

7.3 <u>Absence of Litigation</u>. No action, suit or proceeding before any court or any other governmental body or authority shall have been instituted or threatened that might restrain, prohibit, or invalidate any of the transactions contemplated by this Agreement.

18

7.4 <u>Opinion of Buyer's Counsel</u>.  Seller shall receive from Buyer's counsel an opinion dated as of the Closing Date, in form and substance satisfactory to Seller and its counsel that:

(a) Buyer is duly organized, validly existing and in good standing under the laws of California and has all necessary corporate power to own its properties as now owned and operated by it and to acquire the Assets.

(b) This Agreement has been duly and validly authorized, executed and delivered by Buyer and is valid and binding on Buyer, and is enforceable against it in accordance with its terms.

(c) Neither the execution nor delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement shall constitute (1) a default or an event that would, with notice, lapse of time, or both, constitute a default under, or a violation of Buyer's articles of incorporation or bylaws, or to the best of counsel's knowledge, any lease or other agreement to which Buyer is a party or by which its assets may be bound, or an event that would result in the creation or imposition of any lien, charge or encumbrance on any Asset.

ARTICLE VIII

TERMINATION, AMENDMENT AND WAIVER

8.1 <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing Date by mutual consent of Seller and Buyer; or by Buyer, if a material default under or a material breach of this Agreement by Seller shall have occurred and be continuing for ten (10) days after receipt of notice thereof from Buyer; provided, however, if Seller is actively seeking to cure such default or breach and requires additional time to effect such cure, the Closing Date shall be extended by such reasonable time as Seller shall reasonably require to cure the default or breach.

8.2 <u>Amendment</u>.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

8.3 <u>Extension; Waiver</u>.  At any time prior to the Closing Date, to the extent legally allowed, either party hereto (a) may extend the time for performance of any of the obligations owed to such party by the other party hereto, (b) may waive any inaccuracies in the representations and warranties made to such

party contained herein or in any document delivered pursuant hereto, or (c) may waive compliance with any of the agreements or conditions for the benefit of such party contained herein. Any agreement on the part of a party hereto to any such extension or waiver shall be valid if set forth in an instrument in writing signed on behalf of such party and shall be effective only to the extent set forth in such instrument. No extension or waiver of any single condition, covenant, agreement, representation, warranty, breach, default or other matter hereunder shall be deemed an extension or waiver of such or any other condition, covenant, agreement, representation, warranty, breach, default or other matter theretofore or thereafter occurring. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. The failure of any party to insist upon a strict performance of any of the terms or provisions of this Agreement, or to exercise any right or remedy herein contained, shall not be construed as a waiver or as a relinquishment for the future of such term, provision, right or remedy, but the same shall continue and remain in full force and effect.

## ARTICLE IX

### GENERAL PROVISIONS

9.1 <u>Seller's Indemnification</u>. Seller shall indemnify and hold harmless Buyer and its Affiliates from and against any and all "Losses" (as defined below) incurred by, imposed on, borne by or asserted against any of such indemnified parties in any way relating to, arising out of or resulting from any breach of any warranties or agreements made by Seller under Sections 3.2, 3.5, 3.6, 3.7, 3.12 and/or 5.9 which Losses arise within one year from the Closing Date, Buyer shall promptly notify Seller of the existence of any claim asserted by a third party against any indemnified party on which Buyer intends to assert an indemnification claim for Losses, and shall give Seller a reasonable opportunity to defend the same at its own expense and with counsel of its own selection; provided that Buyer shall at all times also have the right to participate in the defense at its own expense. If, within fifteen (15) days after Buyer has given Seller the notice, Seller fails to undertake the defense of the claim, Buyer shall have the right, but not the obligation, to undertake the defense of, and to compromise or settle (using reasonable business judgment) the claim or other matter on behalf and at the risk of Seller. If the claim is one that cannot be defended solely by Seller, Buyer shall make available all information and assistance that Seller may reasonably request.

20

For purposes of this Agreement, "Losses" shall mean any and all liabilities, obligations, losses, damages, claims, deficiencies, penalties, taxes, levies, actions, judgments, settlements, suits, costs, legal fees, disbursements or expenses (including interest, penalties, attorney's fees, accounting fees and expert witness fees). Losses shall exclude any amount which any party actually receives under any insurance policy which provides coverage for the liability in question. Losses shall not include any losses from any claim for any infringement for any non-contractual use by any third party of any Colt image. "Affiliates" shall mean only officers, directors, shareholders, and employees of Buyer or Seller. Any Losses payable by Seller to Buyer may be collected by Buyer only by withholding the amounts next payable by Buyer to Seller under the Earn-Out payments as provided in Section 2.4 until paid in full.

9.2 <u>Buyer's Indemnification</u>. Buyer shall indemnify, defend and hold harmless Seller and its Affiliates from and against any and all "Losses" (as defined above) incurred by, imposed on, borne by or asserted against any of such indemnified parties in any way relating to or arising out of or resulting from:

(a) The material breach of any of the representations or warranties made by Buyer in this Agreement;

(b) The material breach or the failure of performance by Buyer of any of the covenants, promises or agreements that it is bound to perform under this Agreement after the Closing Date, or

(c) Buyer's conduct of its operations after the Closing Date, other than a Loss existing as of the Closing as a result of any breach of Seller's warranties under Sections 3.2, 3.5, 3.6, 3.7, 3.12 and/or 5.9 as provided in Section 9.1.

9.3 <u>Survival of Representations and Warranties of Seller Only</u>. Except as otherwise provided in Section 9.1, no representation or warranty of Seller shall survive the Closing.

9.4 <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed given upon personal delivery, facsimile transmission (with written or facsimile confirmation of receipt), or delivery by a reputable overnight commercial delivery service (delivery, postage or freight charges prepaid), or on the fourth day following deposit in the United States mail (if sent by registered or certified mail, return receipt requested, delivery postage or fright charges prepaid), addressed to the parties at the following addresses or fax numbers

Case: 10-01080   Doc# 1   Filed: 07/02/10   Entered: 07/02/10 13:33:03   Page 25 of 80

(or at such other address or fax number for a party as shall be specified by like notice:

(a)    if to Seller, to:                with a copy to:

    Jim French                        Samuel Israel, Esq.
    Colt Studios                      Israel, Freedberg & Korbaton LLP
    5733 Lankershim                   11601 Wilshire Boulevard, Suite 2300
    North Hollywood, CA 91601         Los Angeles, CA 90028
    Fax: (818) 985-2145 and           Fax: (310) 553-2200
    8001 Woodrow Wilson Drive
    Los Angeles, CA 90046
    Fax: (323) 650-6943

(b)    if to Buyer, to:                 with a copy to:

    John Rutherford                   Peter S. Buchanan, Esq.
    Prowest Media Corporation         153 Townsend Street, Suite 950
    1617 Church Street                San Francisco, CA 94107-1907
    San Francisco, CA 94131           Fax: (415) 896-2934 and
    Fax: (415) 643-5305               P.O. Box 217/171 Mesa Road
                                      Bolinas, CA 94924
                                      Fax: (415) 868-0706

      9.5 <u>Construction and Interpretation</u>.    The parties have participated jointly in the negotiation and drafting of this Agreement.    In the event any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.    When a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference shall be to an Article, Section, Exhibit or Schedule to this Agreement unless otherwise indicated. Any reference to any federal, state, local or foreign statute shall be deemed to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.    The words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation."    The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.    The parties intend that each representation, warranty and covenant contained herein shall have independent significance.    If any party has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) that the party has not breached shall not detract from or mitigate the fact that

22

the party is in breach of the first representation, warranty or covenant.

Whenever reference is made in this Agreement to the "knowledge" of Seller, such term means the actual knowledge of Seller or Jim. Prior to making any representation based on knowledge, Jim has read each of the representations and warranties in Sections 3.1 through 3.12 and each related Schedule and Seller has caused each of its managers to make diligent inquiry of the employees within whose normal scope of duties and authority the matters required to be disclosed in such representations, warranties and Schedules would normally fall.

9.6 <u>Counterparts and Facsimiles</u>. This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts and sent by facsimile and all of the counterparts taken together shall be deemed to constitute one and the same agreement and shall become effective when all counterparts have been signed by each of the parties and delivered by facsimile or otherwise to the other party, it being understood that all parties need not sign the same counterpart or facsimile.

9.7 <u>Integration</u>. This Agreement and Exhibits, Schedules, documents, instruments and other agreements among the parties hereto that are referred to herein constitute the entire agreement among the parties with respect to the subject matter set forth herein or therein and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof or thereof. Notwithstanding the foregoing, the provisions of Paragraph 15(a) of that certain letter agreement between Colt Studios, Jim and Prowest Media Corporation, a copy of which is attached as Exhibit J, shall continue to apply and be binding upon the parties following the execution of this Agreement until the Closing Date or, if there is no Closing, permanently.

9.8 <u>Governing Law</u>. This Agreement and the rights and obligations of the parties hereunder shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California, excluding its rules of conflicts of laws.

9.9 <u>Assignment</u>. No party hereto shall assign or transfer or permit the assignment or transfer of this Agreement without the prior written consent of the other parties; provided, however, that Buyer may assign any of its rights and obligations hereunder to any entity that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common

23

control with Buyer; provided, however, that such entity shall assume, by a writing delivered to Seller, all of the rights and obligations of Buyer hereunder and Buyer shall continue to be liable for all of its obligations hereunder until paid in full.

9.10 <u>Severability</u>. Any portion or provision of the Agreement which is invalid, illegal, or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining portions or provisions hereof in such jurisdiction or, to the extent permitted by law, rendering that or any other portion or provision of the Agreement invalid, illegal or unenforceable in any other jurisdiction.

9.11 <u>Arbitration</u>. Any dispute that arises under or relating to this Agreement (whether contract, tort or both, but excluding only injunctive relief) shall be arbitrated by the American Arbitration Association in accordance with the then existing commercial arbitration rules of the American Arbitration Association. Judgment on the award rendered by such arbitrator may be entered in any court having jurisdiction.

9.12 <u>Attorneys' Fees</u>. If any party to this Agreement shall bring any action, suit, counterclaim or appeal for any relief against any other party, declaratory or otherwise, to enforce the terms hereof or to declare rights hereunder (collectively, an "Action"), the prevailing party shall be entitled to recover as part of any such Action its reasonable attorneys' fees and costs, including any fees and costs incurred in bringing and prosecuting the Action and/or enforcing any order, judgment, ruling or award granted as part of the Action. "Prevailing party" within the meaning of this section, includes a party who agrees to dismiss an Action upon the other party's payment of all or a substantial portion of the sums allegedly due or performance of the covenants allegedly breached, or who obtains substantially the relief sought by it.

24

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

COLT STUDIOS, a
Nevada corporation

By _____
Jim French, President

_____
JIM FRENCH, individually


PROWEST MEDIA CORPORATION, a
California corporation

By_____  5-13-05
John Rutherford, President

_____  5-13-05
JOHN RUTHERFORD, individually

25

Schedule 1.1

Assets

All rights of ownership in and to the Colt Brand and name,
including the names Colt Studio, Cadre, Buckshot Productions, Colt
Men, The Best Colt Men, Spurs, Olympus, Colt Calendar Men,
Legendary Bodies, and Rip Colt; all Colt magazines, Colt calendars,
and Colt videos, films, and DVDs, and all masters, submasters and
original footage thereof; the Colt Website; all current and expired
customer lists, including names, addresses, telephone numbers and
e-mail addresses, and hardware and software; Colt wholesale and
retail mail order business; all Colt calendar images other than Jim
French/State of Man images in all formats; all office equipment;
all negatives of all published images in all Colt magazines, Colt
calendars, on the internet and published in or on all other forms;
all inventory of all Colt magazines, calendars, videos, films, DVDs
and merchandise; all copyrights for all Colt magazines, calendars,
DVDs, videos and films; all Colt trademarks and goodwill associated
with the previously listed assets; all model releases and related
documents for each Colt video, film and DVD; and two vehicles, a
1995 white Chevrolet SV (VIN 1CNDU05d457129769), free and clear of
all liabilities, and a 1996 green GMC SV (VIN 101KDM18W8TB506175),
subject to a lease with a balance due of $8,934 as of May 1, 2003
(the "Auto Lease"), and assignment of the lease from Seller to
Buyer; telephone numbers 800-445-2658, 818-985-5786; 818-985-9170;
and 888-333-2658; fax number 818-985-2145; Post Office Boxes 1608,
1009 and 1933, Studio City, CA 91614; alarm code; and other Assets
as added to this list by Seller and/or Buyer on or before the
Closing Date, including in Schedule 1.1(b).



## Schedule 1.1(a)

## Specific Assets at Closing Date

1.  Sole and complete ownership of and all rights in any and all formats now known or as hereafter developed in the future of the ____ titles of all Colt videos, films and DVDs itemized in Schedule 1.1(a) throughout the universe in perpetuity. This ownership includes all edited masters, duplication masters, and source tapes in all sizes and formats, "edit decision lists," original and dupe chromes, images on disc, one-sheets, printing negatives, color keys and proofs, design elements of all packaging, model releases and proof of age as being at least 18 years, prior ad copies, brochures, unsold inventory and packaging, promotional materials and press releases, and any and all other material relating to these ____ titles.

2.  Sole and complete ownership of all rights in any and all formats now known or as hereafter developed in the future of the ____ Colt calendars listed in Schedule ____ throughout the universe. The ownership includes all calendars, including all negatives of all published images therein.

3.  Sole and complete ownership of all rights in any and all formats now known or as hereafter developed in the future of the ____ Colt magazines listed in Schedule ____ throughout the universe. The ownership includes all magazines, including all negatives of all published images therein.

4.  All existing distribution and licensing agreements pertaining to the ____ titles itemized in Schedule 1.1(a).

5.  All mail order/internet rights throughout the universe in perpetuity pertaining to the ____ titles itemized in Schedule 1.1(a).

6.  Copies of all model releases and related documents for each of the ____ titles itemized in Schedule 1.1(a), and all promotional materials and press releases for each of the ____ titles itemized in Schedule 1.1(a).

7.  Access to and use thereof, for the purpose of scanning, the original chromes for each of the ____ titles itemized in Schedule 1.1(a).

8.  One dupe master tape in whatever format Buyer requests and such replacement master tapes as may become necessary of each video, film and DVD titles itemized in Schedule 1.1(a). Such masters and replacements shall be at Seller's expense.

9.  Direct assignment from Seller to Buyer of all existing copyrights and trademarks appurtenant to the Assets itemized in Schedule 1.1(a).

10. Direct assignment, sale and transfer from Seller to Buyer of ownership of all Colt websites including _____, and the root user-names and passwords to the appurtenant URL addresses.

11. All current and expired customer mailing lists of Seller, including names, addresses, telephone numbers and e-mail addresses.

12. All goodwill associated with or used by Seller in connection with the Assets (collectively, "Goodwill").

Schedule 2.2

Allocation of Purchase Price

Fixed Assets:

    Inventory
        Colt Videos
        Colt Films
        Colt DVDs
        Colt Magazines
        Colt Calendars

| | | |
|---|---|---|
| Colt Merchandise        Total | $ | 300,000 |
| Masters, Submasters and original footage of all Colt videos, films and DVDs | | 5,000 |
| Published images in all Colt magazines, calendars, on the internet, and published in all other formats | | 15,000 |
| Office Equipment | | 5,000 |
| Colt Website | | 1,000 |

Intangible Assets:

| | |
|---|---|
| Copyrights of all Colt videos, films, DVDs, magazines and calendars | 300,000 |
| Trademarks for Colt Brand and name, including the names Colt Studio, Cadre, Buckshot Productions, Colt Men, Best of Colt Men, Spurs, Olympus, Colt Calendar Men, Legendary Bodies, LT Collection, TNT Productions, and Rip Colt | 50,000 |
| Goodwill | 1,819,000 |
| TOTAL PURCHASE PRICE | $2,495,000 |



Schedule 3.2

Title to the Assets

The Auto Lease and Seller's accounting software program lease.

Schedule 3.3

Financial Statements

Schedule 3.5

Inventory

Schedule 3.6

Other Tangible Personal Property

The 1996 green GMC SV (VIN 1GKDM19W9TB508175).

Schedule 3.7

Tradenames, Trademarks and Copyrights

Schedule 3.8

Compliance with Law

Schedule 3.10

Consents and Approvals

Schedule 3.11

Litigation

Schedule 3.12

Customers

Schedule 3.14

Full Disclosure

Schedule 4.3

Consents and Approvals

Exhibit A

Lease

Exhibit B

Escrow Agreement

Exhibit C

Noncompetition Agreement

Exhibit D

Consulting and Photographic Services Agreement

Exhibit E

Option Agreement

Exhibit F

Promissory Note

Exhibit G

Security Agreement

Exhibit H

General Instrument of Conveyance, Transfer and Assignment

Exhibit I

Bill of Sale

Exhibit J

Action by Written Consent of the Board of
Directors and Shareholder of Seller

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "Agreement") is made on June _10_, 2003, by and between PROWEST MEDIA CORPORATION ("Debtor"), a California corporation, and COLT STUDIO ("Secured Party"), a California corporation, with reference to the following facts.

## RECITALS:

Debtor is obligated to make payments under the terms of a promissory note in the principal amount of Two Million Two Hundred Thousand Dollars ($2,200,000) dated June __, 2003 (the "Note") payable by Debtor to Secured Party, as set forth in Exhibit A, and pursuant to the Earn-Out (the "Earn-Out") set forth in section 2.4 of the Asset Purchase Agreement between Debtor and Secured Party dated May _10_, 2003 (the "Asset Purchase Agreement").

As security for Debtor's full and timely performance of such payment obligations under the Note, the Earn-Out and all other obligations and liabilities of Debtor to Secured Party hereunder, Debtor grants a security interest to Secured Party in certain Collateral (as hereinafter defined) set forth below.

## AGREEMENT:

1.  <u>Definitions</u>.  As used in this Agreement:

    (a)  "Collateral" means the personal property of Debtor listed in Schedule 1(a).  From all rights, title and interests of Debtor in the Collateral only, all accounts as that term is defined in section 9102(a)(2) of the California Commercial Code, hereafter acquired by Debtor, from the sale, lease, license and other exploitation of any of the Collateral only, including all accounts receivable, other receivables, and other forms of obligations (other than forms of obligation evidenced by (1) chattel paper, as such term is defined in section 9102(a)(11) of the California Commercial Code, now owned or hereafter acquired by any person or entity, wherever located, (2) documents as that term is defined in section 9102(a)(30) of the California Commercial Code, now owned or hereafter acquired by any person or entity, wherever located, or (3) instruments, as that term is defined in section 9102(a)(47) of the California

1

EXHIBIT "B"

Commercial Code, now owned or hereafter acquired by Debtor, wherever located, whether arising out of the sale of goods as defined in section 9102(a)(44) of the California Commercial Code, now owned or hereafter acquired by Debtor, or whether arising out of goods sold; (b) all of Debtor's rights in, to or under all purchase orders or receipts for goods; (c) all money due or to become due to Debtor under all purchase orders and contracts for the sale of goods, including the right to receive the proceeds of those purchase orders; (d) all insurance proceeds and claims against third parties for loss or damage to or destruction of any Collateral; and (e) all collateral security and guaranties of any kind given by any other debtor to Debtor with respect to any of the foregoing.

(b) "Documents" means any documents, as that term is defined in section 9102(a)(3) of the California Commercial Code, now owned or hereafter acquired by Debtor, wherever located.

(c) "Indebtedness" means all of Debtor's Obligations to Secured Party under the terms of this Security Agreement and the Promissory Note and the Earn-Out, payable by Debtor to Secured Party.

(d) "Lien" means any security interest, mortgage, pledge, lien, attachment, claim, charge, encumbrance, or agreement retaining title covering the Collateral.

(e) "Obligations" means existing indebtedness and liability of Debtor to Secured Party, including all obligations under the Note, the Earn-Out, and attorneys' fees and costs incurred by Secured Party in enforcing this Agreement or collecting payment under it.

Terms defined in the California Commercial Code (the "Code") not otherwise defined in this Agreement are used in this Agreement as defined in the Code on the date of this Agreement.

2. <u>Grant of Security Interest</u>. As security for Debtor's due and punctual performance of the Obligations, Debtor hereby grants, assigns, transfers and conveys to Secured Party a continuing security interest in all of Debtor's right, title and interest in and to the Collateral. Debtor grants Secured Party

2

a security interest in the Collateral to secure payment of the Obligations in accordance with their respective payment terms.

     3.   <u>Debtor's Covenants</u>.  Debtor covenants and agrees with Secured Party that from the date hereof and until payment and satisfaction in full of each and all of the Obligations, unless Secured Party shall otherwise consent in writing, Debtor will:

     (a)   Pay the Obligations to Secured Party when they are due.

     (b)   Pay all expenses, including attorneys' fees, incurred by Secured Party in the perfection, preservation, realization, enforcement and exercise of Secured Party's rights under this Agreement.

     (c)  Conduct Debtor's business efficiently without voluntary interruption.

     (d)   Perform all acts necessary to maintain, preserve, and protect the Collateral.

     (e)   Notify Secured Party promptly in writing of any default that might have a materially adverse effect on the Collateral.

     (f) Duly observe and perform each and every term and condition of any and all agreements, instruments and documents relating to the Collateral, and diligently protect and enforce its rights under all such documents.

     (g)   Execute and deliver to Secured Party all financing statements and other documents that Secured Party reasonably requests, in order to maintain a perfected security interest in the Collateral.

     (h) Give Secured Party fifteen (15) days prior written notice before changing its principal place of business or moving the books and records to a location other than that listed in Section 15.

     (i) Except for any lien, charge or other encumbrance against any Collateral or portion thereof as of the

Case: 10-01080   Doc# 1   Filed: 07/02/10   Entered: 07/02/10 13:33:03   Page 57 of 80

date of this Agreement, promptly pay or otherwise cause to be discharged all liens, charges, security interests or other encumbrances that may attach to any Collateral or portion thereof.

(j) Not sell, lease, assign, transfer, convey, pledge, hypothecate or further encumber any of the Collateral except in the ordinary course of its business without the prior written consent of Secured Party.

(k) Promptly give Secured Party notice of any litigation that may have a material adverse effect on Debtor's business.

(l) Except for any claim, lien, charge or other encumbrance against any Collateral as of the date of this Agreement, will promptly pay all claims, liens, security interests, demands and other encumbrances of third parties arising after the date of this Agreement claiming an interest in the Collateral that is adverse to Secured Party's security interest in the Collateral hereunder.

(m) Promptly notify Secured Party of any attachment or other legal process levied against any of the Collateral or any threatened or filed claims or proceedings that might in any way affect or impair Secured Party's security interest in the Collateral or the rights and remedies of Secured Party with respect thereto.

(n) At the request of Secured Party, execute and permit to be filed one or more financing statements, and amendments thereto, under the California Uniform Commercial Code naming Debtor as debtor and Secured Party as secured party of the Collateral.

(o) Except as otherwise provided herein, not, without the prior written consent of Secured Party, execute, file or authorize or permit to be filed in any other jurisdiction or with any other governmental authority any financing or similar statement relating to the Collateral, or any portion thereof, in which any person other than Secured Party is named as a secured party thereunder.

4

(p)   Execute and deliver to Secured Party any and all further agreements, instruments, or documents as Secured Party may, in its reasonable discretion, deem necessary or advisable in order to evidence, effectuate, perfect, protect, maintain, or realize upon Secured Party's security interest in the Collateral or the priority therein as provided hereinabove.

Notwithstanding an provision contained herein to the contrary with respect to the Collateral purchased by Debtor from Secured Party pursuant to the terms of the Asset Purchase Agreement, Debtor shall have no obligation under this Agreement to improve the condition of any Collateral purchased by Debtor from Secured Party under the Asset Purchase Agreement.

4.   <u>Debtor's Warranties and Representations</u>.  Debtor covenants, warrants and represents to Secured Party as follows:

(a) Debtor is a corporation duly organized, validly existing and in good standing under the laws of the State of California and has all necessary authority to conduct its business  wherever it is conducted.

(b) Debtor has been authorized to execute and deliver this Agreement.  This Agreement is a valid and binding obligation of Debtor.

(c)  Except for any lien liabilities, pledges, charges, encumbrances, security interests leases or licenses in the Collateral, this Agreement is a valid and binding obligation of Debtor and creates a security interest against the Collateral in which Debtor now has rights and creates a perfected first-priority security interest enforceable against the Collateral.

(d)  Neither the execution and delivery of this Agreement, nor the taking of any action in compliance with it, will (i) violate or breach any law, regulation, rule, order or judicial action binding on Debtor, any agreement to which Debtor is a party; or (ii) result in the creation of a lien against the Collateral except that created by this Agreement.
(e)  No default or potential default exists.

(f)  Schedule A hereto states, without exceptions:

5

        (1)  Debtor's mailing address.

        (2)  The location of the Collateral.

        (3)  All the names under which Debtor has conducted its business.

Debtor will notify Secured Party in writing before any change occurs in any of the above.

(g)  Debtor owns and has possession of the Collateral, subject only to those liens and adverse claims identified in Schedule 5(e).

5.  <u>Secured Party's Duties</u>. Secured Party has no duty or liability for the Collateral except to exercise reasonable care while it is in Secured Party's possession.

6.  <u>Termination</u>. This Agreement will continue in effect as long as there are any outstanding Obligations under this Agreement. This Agreement will terminate when (a) Debtor completes performance of all Obligations to Secured Party, including, without limitation, the payment of all Indebtedness by Debtor to Secured Party; and (b) Debtor has notified Secured Party in writing of the termination.

7.  <u>Default</u>. Debtor will be in default under this Agreement upon the occurrence of any of the following:

(a) Debtor fails to pay any Obligations, or any portion thereof, when due, at stated maturity, on accelerated maturity, or otherwise.

(b) Debtor commits any material breach of this Agreement.

(c) Any of Debtor's representations or warranties contained herein proves materially false or misleading in any way.

(d) Breach any covenant or promise contained herein.

(e) Any case is commenced by or against Debtor under any bankruptcy, reorganization, arrangement, readjustment

6

of debt or moratorium law or similar statute which is not dismissed within ninety (90) days.

(f) Any writ of attachment, garnishment, execution or other legal process is issued against any Collateral if such writ, garnishment, execution or other process is not fully vacated within ninety (90) days.

(g) Debtor seeks, consents to, acquiesces in or fails to cause to be vacated or stayed within ninety (90) days (or vacated within ninety (90) days of any such stay) the appointment of a receiver, trustee or conservator of all or any substantial portion of the Collateral.

8. <u>Remedies</u>. When an event of default occurs:

(a) Secured Party may exercise all rights and remedies available to a secured creditor after default, including, without limitation, the rights and remedies of secured creditors under the California Commercial Code.

(b) Secured Party's notice of the time and place of public sale of the Collateral, or the time on or after which a private sale or other disposition of the Collateral will be made, is reasonable if sent to Debtor in the manner for giving notice at least five (5) days before the public or private sale.

(c) Debtor must:

(1) Assemble the Collateral and make it and all records relating to it available to Secured Party as Secured Party directs.

(2) Allow Secured Party, its representatives, and its agents to enter the premises where all or any part of the Collateral, the records, or both may be, and remove any or all of it.

9. <u>Attorneys' Fees and Costs</u>. Debtor will pay all costs and expenses of Secured Party incurred by Secured Party in enforcing its rights under this Agreement, including reasonable attorneys' fees.

7

10. <u>Waiver by Secured Party</u>.  No waiver by Secured Party of any breach or default will be a waiver of any breach or default occurring later.  A waiver will be valid only if it is in writing and signed by Secured Party.

11. <u>Survival of Representations and Warranties</u>. Debtor's representations and warranties made in this Agreement will survive its execution, delivery and termination.

12. <u>Assignment</u>.  This Agreement will bind and benefit the successors and assignees of the parties, but Debtor may not assign its rights under this Agreement without Secured Party's prior written consent, not to be unreasonably withheld or delayed.

13. <u>Governing Law</u>.  This Agreement will be governed by the laws of the State of California.

14. <u>Entire Agreement</u>.  This Agreement is the entire agreement and supersedes any prior agreement or understandings between Secured Party and Debtor relating to the security interest of Secured Party in the Collateral.

15. <u>Notices</u>. All notices, requests, demands and other communications hereunder shall be deemed to have been duly given if in writing and either delivered personally, sent by facsimile transmission or by air courier services, or mailed by postage prepaid, registered or certified U.S. mail, return receipt requested, to the addresses designated below or such other addresses as may be designated in writing by notice given hereunder and shall be effective upon personal delivery or facsimile transmission thereof or upon delivery by registered or certified U.S. mail or one business day following deposit with an air courier service:

8

If to Debtor:

Prowest Media Corporation
1617 Church Street
San Francisco, CA 94131
Fax: 415-643-5305

With a courtesy copy to:

Peter S. Buchanan, Esq.
153 Townsend Street, Suite 950
San Francisco, CA 94107-1907
Fax: 415-896-2934 & 415-868-0706

If to Secured Party:

Colt Studio
Attn: Jim French
5733 Lankershim
North Hollywood, CA 90046
Fax: 818-985-2145 and
8001 Woodrow Wilson Drive
Los Angeles, CA 90046
Fax: 323-650-6943

With a courtesy copy to:

Samuel Israel
Israel, Friedberg & Korbatov, LLP
1160 Wilshire Blvd., Suite 2200
Los Angeles, CA 90028
Fax: 310-553-2290

Any party may change his or its address for service of notice,
by notice to the other.

        16.  References.  All "paragraph" references herein
are to this Agreement.

                              JUNE 10
            Dated as of  ~~May~~ __, 2003.   Ø

DEBTOR:

PROWEST MEDIA CORPORATION,
a California corporation

By_____

    John Rutherford, President

SECURED PARTY:

COLT STUDIO, a California
corporation

By_____

    Jim French, President

9

Schedule 1(a)

Collateral

All rights of ownership in and to the Colt Brand and name,
including the names Colt Studio, Cadre, Buckshot Productions,
Colt Men, Best of Colt Men, Spurs, Olympus, Colt Calendar Men,
Legendary Bodies, LT Collection, TNT Productions and Rip Colt;
all Colt magazines, Colt calendars, and Colt videos, films, and
DVDs, and all masters, submasters and original footage thereof;
the Colt Website; all current and expired customer lists,
including names, addresses, telephone numbers, e-mail addresses,
and hardware and software; all telephone numbers, including 800-
445-2658, 818-985-5786; 818-985-9170 and 888-333-2658; fax
number 818-985-2145; the alarm code for the Premises; all post
office boxes, including, without limitation, Post Offices Boxes
1608, 1009 and 1933, Studio City, CA 91614; Colt wholesale and
retail mail order business; all Colt calendar images other than
Jim French/State of Man images in all formats; all office
equipment; all negatives of all published images in all Colt
magazines, Colt calendars, on the internet and published in or
on all other forms; all inventory of all Colt magazines,
calendars, videos, films, DVDs and merchandise; all copyrights
for all Colt magazines, calendars, DVDs, videos and films; all
Colt trademarks and goodwill associated with the previously
listed assets; all model releases and related documents for each
Colt video, film and DVD; and two vehicles, a 1995 white
Chevrolet SV (VIN 1CNDU05d457129769), free and clear of all
liabilities, and a 1996 green GMC SV (VIN 101KDM18W8TB506175),
subject to a lease with a balance due of $8,934 as of May 1,
2003, and assignment of the lease from Seller to Buyer; and all
other Assets as added to this list by Seller and/or Buyer on or
before the Closing Date, including in Schedule 1.1(b).

Case: 10-01080    Doc# 1    Filed: 07/02/10    Entered: 07/02/10 13:33:03    Page 64 of 80

Schedule 1.1(b)

Additional Assets

Schedule 5(e)

1. Debtor's mailing address is 1617 Church Street, San Francisco, California 94131.

2. The Collateral is located at 5733 Lankershim Boulevard, North Hollywood, CA 91601.

3. Prowest Media Corporation

Exhibit A

Promissory Note

If to Debtor:

Prowest Media Corporation
1617 Church Street
San Francisco, CA 94131
Fax: 415-643-5305

If to Secured Party:

Colt Studio
Attn: Jim French
5733 Lankershim
North Hollywood, CA 90046
Fax: 818-985-2145 and
8001 Woodrow Wilson Drive
Los Angeles, CA 90046
Fax: 323-650-6943

With a courtesy copy to:

Peter S. Buchanan, Esq.
153 Townsend Street, Suite 950
San Francisco, CA 94107-1907
Fax: 415-896-2934 & 415-868-0706

With a courtesy copy to:

Samuel Israel
Israel, Friedberg & Korbatov, LLP
1160 Wilshire Blvd., Suite 2200
Los Angeles, CA 90028
Fax: 310-553-2290

Any party may change his or its address for service of notice, by notice to the other.

        16.  Reference. All "paragraph" references herein are to this Agreement.

        Dated as of May __, 2003.

DEBTOR:                              SECURED PARTY:

PROWEST MEDIA CORPORATION,           COLT STUDIO, a California
a California corporation             corporation

By____  _____             By_____

   John Rutherford, President           Jim French, President

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "Agreement") is made on June 10, 2003, by and between PROWEST MEDIA CORPORATION ("Debtor"), a California corporation, and COLT STUDIO ("Secured Party"), a California corporation, with reference to the following facts.

## RECITALS:

Debtor is obligated to make payments under the terms of a promissory note in the principal amount of Two Million Two Hundred Thousand Dollars ($2,200,000) dated June __, 2003 (the "Note") payable by Debtor to Secured Party, as set forth in Exhibit A, and pursuant to the Earn-Out (the "Earn-Out") set forth in section 2.4 of the Asset Purchase Agreement between Debtor and Secured Party dated May 10, 2003 (the "Asset Purchase Agreement").

As security for Debtor's full and timely performance of such payment obligations under the Note, the Earn-Out and all other obligations and liabilities of Debtor to Secured Party hereunder, Debtor grants a security interest to Secured Party in certain Collateral (as hereinafter defined) set forth below.

## AGREEMENT:

1. __Definitions__. As used in this Agreement:

(a) "Collateral" means the personal property of Debtor listed in Schedule 1(a). From all rights, title and interests of Debtor in the Collateral only, all accounts as that term is defined in section 9102(a)(2) of the California Commercial Code, hereafter acquired by Debtor, from the sale, lease, license and other exploitation of any of the Collateral only, including all accounts receivable, other receivables, and other forms of obligations (other than forms of obligation evidenced by (1) chattel paper, as such term is defined in section 9102(a)(11) of the California Commercial Code, now owned or hereafter acquired by any person or entity, wherever located, (2) documents as that term is defined in section 9102(a)(30) of the California Commercial Code, now owned or hereafter acquired by any person or entity, wherever located, or (3) instruments, as that term is defined in section 9102(a)(47) of the California

Commercial Code, now owned or hereafter acquired by Debtor, wherever located, whether arising out of the sale of goods as defined in section 9102(a)(44) of the California Commercial Code, now owned or hereafter acquired by Debtor, or whether arising out of goods sold; (b) all of Debtor's rights in, to or under all purchase orders or receipts for goods; (c) all money due or to become due to Debtor under all purchase orders and contracts for the sale of goods, including the right to receive the proceeds of those purchase orders; (d) all insurance proceeds and claims against third parties for loss or damage to or destruction of any Collateral; and (e) all collateral security and guaranties of any kind given by any other debtor to Debtor with respect to any of the foregoing.

(b) "Documents" means any documents, as that term is defined in section 9102(a)(3) of the California Commercial Code, now owned or hereafter acquired by Debtor, wherever located.

(c) "Indebtedness" means all of Debtor's Obligations to Secured Party under the terms of this Security Agreement and the Promissory Note and the Earn-Out, payable by Debtor to Secured Party.

(d) "Lien" means any security interest, mortgage, pledge, lien, attachment, claim, charge, encumbrance, or agreement retaining title covering the Collateral.

(e) "Obligations" means existing indebtedness and liability of Debtor to Secured Party, including all obligations under the Note, the Earn-Out, and attorneys' fees and costs incurred by Secured Party in enforcing this Agreement or collecting payment under it.

Terms defined in the California Commercial Code (the "Code") not otherwise defined in this Agreement are used in this Agreement as defined in the Code on the date of this Agreement.

2. Grant of Security Interest. As security for Debtor's due and punctual performance of the Obligations, Debtor hereby grants, assigns, transfers and conveys to Secured Party a continuing security interest in all of Debtor's right, title and interest in and to the Collateral. Debtor grants Secured Party

a security interest in the Collateral to secure payment of the Obligations in accordance with their respective payment terms.

3. Debtor's Covenants. Debtor covenants and agrees with Secured Party that from the date hereof and until payment and satisfaction in full of each and all of the Obligations, unless Secured Party shall otherwise consent in writing, Debtor will:

(a) Pay the Obligations to Secured Party when they are due.

(b) Pay all expenses, including attorneys' fees, incurred by Secured Party in the perfection, preservation, realization, enforcement and exercise of Secured Party's rights under this Agreement.

(c) Conduct Debtor's business efficiently without voluntary interruption.

(d) Perform all acts necessary to maintain, preserve, and protect the Collateral.

(e) Notify Secured Party promptly in writing of any default that might have a materially adverse effect on the Collateral.

(f) Duly observe and perform each and every term and condition of any and all agreements, instruments and documents relating to the Collateral, and diligently protect and enforce its rights under all such documents.

(g) Execute and deliver to Secured Party all financing statements and other documents that Secured Party reasonably requests, in order to maintain a perfected security interest in the Collateral.

(h) Give Secured Party fifteen (15) days prior written notice before changing its principal place of business or moving the books and records to a location other than that listed in Section 15.

(i) Except for any lien, charge or other encumbrance against any Collateral or portion thereof as of the

date of this Agreement, promptly pay or otherwise cause to be discharged all liens, charges, security interests or other encumbrances that may attach to any Collateral or portion thereof.

(j) Not sell, lease, assign, transfer, convey, pledge, hypothecate or further encumber any of the Collateral except in the ordinary course of its business without the prior written consent of Secured Party.

(k) Promptly give Secured Party notice of any litigation that may have a material adverse effect on Debtor's business.

(l) Except for any claim, lien, charge or other encumbrance against any Collateral as of the date of this Agreement, will promptly pay all claims, liens, security interests, demands and other encumbrances of third parties arising after the date of this Agreement. claiming an interest in the Collateral that is adverse to Secured Party's security interest in the Collateral hereunder.

(m) Promptly notify Secured Party of any attachment or other legal process levied against any of the Collateral or any threatened or filed claims or proceedings that might in any way affect or impair Secured Party's security interest in the Collateral or the rights and remedies of Secured Party with respect thereto.

(n) At the request of Secured Party, execute and permit to be filed one or more financing statements, and amendments thereto, under the California Uniform Commercial Code naming Debtor as debtor and Secured Party as secured party of the Collateral.

(o) Except as otherwise provided herein, not, without the prior written consent of Secured Party, execute, file or authorize or permit to be filed in any other jurisdiction or with any other governmental authority any financing or similar statement relating to the Collateral, or any portion thereof, in which any person other than Secured Party is named as a secured party thereunder.

(p)  Execute and deliver to Secured Party any and all further agreements, instruments, or documents as Secured Party may, in its reasonable discretion, deem necessary or advisable in order to evidence, effectuate, perfect, protect, maintain, or realize upon Secured Party's security interest in the Collateral or the priority therein as provided hereinabove.

Notwithstanding any provision contained herein to the contrary with respect to the Collateral purchased by Debtor from Secured Party pursuant to the terms of the Asset Purchase Agreement, Debtor shall have no obligation under this Agreement to improve the condition of any Collateral purchased by Debtor from Secured Party under the Asset Purchase Agreement.

4.  <u>Debtor's Warranties and Representations</u>.  Debtor covenants, warrants and represents to Secured Party as follows:

(a)  Debtor is a corporation duly organized, validly existing and in good standing under the laws of the State of California and has all necessary authority to conduct its business  wherever it is conducted.

(b)  Debtor has been authorized to execute and deliver this Agreement.  This Agreement is a valid and binding obligation of Debtor.

(c)  Except for any lien liabilities, pledges, charges, encumbrances, security interests leases or licenses in the Collateral, this Agreement is a valid and binding obligation of Debtor and creates a security interest against the Collateral in which Debtor now has rights and creates a perfected first-priority security interest enforceable against the Collateral.

(d)  Neither the execution and delivery of this Agreement, nor the making of any action in compliance with it, will (i) violate or breach any law, regulation, rule, order or judicial action binding on Debtor, any agreement to which Debtor is a party; or (ii) result in the creation of a lien against the Collateral except that created by this Agreement.

(e)  No default or potential default exists.

(f)  Schedule A hereto states, without exceptions:

(1) Debtor's mailing address.

(2) The location of the Collateral.

(3) All the names under which Debtor has conducted its business.

Debtor will notify Secured Party in writing before any change occurs in any of the above.

(g) Debtor owns and has possession of the Collateral, subject only to those liens and adverse claims identified in Schedule 5(e).

5.  Secured Party's Duties. Secured Party has no duty or liability for the Collateral except to exercise reasonable care while it is in Secured Party's possession.

6.  Termination. This Agreement will continue in effect as long as there are any outstanding Obligations under this Agreement. This Agreement will terminate when (a) Debtor completes performance of all Obligations to Secured Party, including, without limitation, the payment of all Indebtedness by Debtor to Secured Party; and (b) Debtor has notified Secured Party in writing of the termination.

7.  Default. Debtor will be in default under this Agreement upon the occurrence of any of the following:

(a) Debtor fails to pay any Obligations, or any portion thereof, when due, at stated maturity, on accelerated maturity, or otherwise.

(b) Debtor commits any material breach of this Agreement.

(c) Any of Debtor's representations or warranties contained herein proves materially false or misleading in any way.

(d) Breach any covenant or promise contained herein.

(e) Any case is commenced by or against Debtor under any bankruptcy, reorganization, arrangement, readjustment

of debt or moratorium law or similar statute which is not dismissed within ninety (90) days.

(f) Any writ of attachment, garnishment, execution or other legal process is issued against any Collateral if such writ, garnishment, execution or other process is not fully vacated within ninety (90) days.

(g) Debtor seeks, consents to, acquiesces in or fails to cause to be vacated or stayed within ninety (90) days (or vacated within ninety (90) days of any such stay) the appointment of a receiver, trustee or conservator of all or any substantial portion of the Collateral.

8. **Remedies.** When an event of default occurs:

(a) Secured Party may exercise all rights and remedies available to a secured creditor after default, including, without limitation, the rights and remedies of secured creditors under the California Commercial Code.

(b) Secured Party's notice of the time and place of public sale of the Collateral, or the time on or after which a private sale or other disposition of the Collateral will be made, is reasonable if sent to Debtor in the manner for giving notice at least five (5) days before the public or private sale.

(c) Debtor must:

(1) Assemble the Collateral and make it and all records relating to it available to Secured Party as Secured Party directs.

(2) Allow Secured Party, its representatives, and its agents to enter the premises where all or any part of the Collateral, the records, or both may be, and remove any or all of it.

9. **Attorneys' Fees and Costs.** Debtor will pay all costs and expenses of Secured Party incurred by Secured Party in enforcing its rights under this Agreement, including reasonable attorneys' fees.

10. **Waiver by Secured Party.** No waiver by Secured Party of any breach or default will be a waiver of any breach or default occurring later. A waiver will be valid only if it is in writing and signed by Secured Party.

11. **Survival of Representations and Warranties.** Debtor's representations and warranties made in this Agreement will survive its execution, delivery and termination.

12. **Assignment.** This Agreement will bind and benefit the successors and assignees of the parties, but Debtor may not assign its rights under this Agreement without Secured Party's prior written consent, not to be unreasonably withheld or delayed.

13. **Governing Law.** This Agreement will be governed by the laws of the State of California.

14. **Entire Agreement.** This Agreement is the entire agreement and supersedes any prior agreement or understandings between Secured Party and Debtor relating to the security interest of Secured Party in the Collateral.

15. **Notices.** All notices, requests, demands and other communications hereunder shall be deemed to have been duly given if in writing and either delivered personally, sent by facsimile transmission or by air courier services, or mailed by postage prepaid, registered or certified U.S. mail, return receipt requested, to the addresses designated below or such other addresses as may be designated in writing by notice given hereunder and shall be effective upon personal delivery or facsimile transmission thereof or upon delivery by registered or certified U.S. mail or one business day following deposit with an air courier service:

## Schedule 1(a)

## Collateral

All rights of ownership in and to the Colt Brand and name, including the names Colt Studio, Cadre, Buckshot Productions, Colt Men, Best of Colt Men, Spurs, Olympus, Colt Calendar Men, Legendary Bodies, LT Collection, TNT Productions and Rip Colt; all Colt magazines, Colt calendars, and Colt videos, films, and DVDs, and all masters, submasters and original footage thereof; the Colt Website; all current and expired customer lists, including names, addresses, telephone numbers, e-mail addresses, and hardware and software; all telephone numbers, including 800-445-2658, 818-985-5786; 818-985-9170 and 800-333-2658; fax number 818-985-2145; the alarm code for the Premises; all post office boxes, including, without limitation, Post Offices Boxes 1608, 1009 and 1933, Studio City, CA 91614; Colt wholesale and retail mail order business; all Colt calendar images other than Jim French/State of Man images in all formats; all office equipment; all negatives of all published images in all Colt magazines, Colt calendars, on the internet and published in or on all other forms; all inventory of all Colt magazines, calendars, videos, films, DVDs and merchandise; all copyrights for all Colt magazines, calendars, DVDs, videos and films; all Colt trademarks and goodwill associated with the previously listed assets; all model releases and related documents for each Colt video, film and DVD; and two vehicles, a 1995 white Chevrolet SV (VIN 1CNDU05d457129769), free and clear of all liabilities, and a 1996 green GMC SV (VIN 101KUM18W8TB506175), subject to a lease with a balance due of $8,934 as of May 1, 2003, and assignment of the lease from Seller to Buyer; and all other Assets as added to this list by Seller and/or Buyer on or before the Closing Date, including in Schedule 1.1(b).

Schedule 1.1(b)

Additional Assets

## Schedule 5(e)

1. Debtor's mailing address is 1617 Church Street, San Francisco, California 94131.

2. The Collateral is located at 5733 Lankershim Boulevard, North Hollywood, CA 91601.

3. Prowest Media Corporation

Exhibit A

Promissory Note